**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALAN PRESSWOOD, D.C., P.C., individually and on behalf of all other similarly-situated persons, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.4:17-cv-01977-SNLJ |
| v. | ) ) | **CLASS ACTION** |
| AMERICAN HOMEPATIENT, INC., a Florida corporation, and JOHN DOES 1-10, | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO COMPEL AND FOR ENTRY**
**OF A PROTECTIVE ORDER REGARDING ELECTRONIC DISCOVERY**

Plaintiff Allan Presswood, D.C., P.C. ("Plaintiff"), submits Plaintiff's Reply Memorandum in Support of Motion to Compel and for Entry of a Protective Order Regarding Electronic Discovery ("Protective Order").

<u>**Introduction**</u>

Plaintiff's motion to compel sought a forensic image(s) of Defendant's storage area networks (SAN), which included RightFax and SQL data, in order to search for the fax transmission logs regarding the June 22, 2013, fax advertisement at issue. In its Response, filed on April 13, 2018 (Doc. 40), Defendant discloses for the first time since this litigation began with the *Geismann* case (filed on August 4, 2014), that backup tapes exist. (*See* Def.'s Resp., Doc. 40, at 6, 14). Ten days later, at the April 23, 2018, deposition of David Morris, Defendant's former Vice President of Information Technology, it was disclosed for the first time that daily backups were maintained for 45 days, months-end backup tapes were retained 18 months, and quarterly tapes were retained seven years at that time." (Morris Dep., attached as Exhibit 17, at

33).  The backup tapes are stored with Iron Mountain, Inc.  (*Id.*) In other words, unless the June 22 fax transmission logs were overwritten/purged within the eight day time period between June 22, 2013 and June 30, 2013, the fax logs should be contained on the June 30, 2013, quarterly backup tape, stored at Iron Mountain.

Based on Defendant's disclosure of the existence of backup tapes, Plaintiff now narrows its motion to compel to all existing backup tapes covering the date on June 22, 2013, including but not limited to the quarterly backup tape, which would have been created on June 30, 2013. Defendant does not disagree, conceding that if "mirror imaging" is allowed in this case, "the backup tapes containing American Homepatient's SAN, as it existed in 2013" should be imaged. (Def.'s Resp. at 14).

Notwithstanding its sea change admission that backup tapes exist, Defendant continues to oppose Plaintiff's motion to compel, arguing: (1) it has already searched for the fax logs and has determined they no longer exist; (2) the "exceptional" circumstances required for an electronic search are absent in this case; (3) granting Plaintiff's motion would delay the case for months, exposing large amounts of irrelevant, privileged, and HIPAA—protected information, "even though there is an extremely slight chance that the discrete data Plaintiff seeks could even be recovered"; and (4) even if imaging were warranted, Plaintiff's proposed Electronic Protective Order (EPO), Doc. 37-1 is contrary to the procedures set forth in *Ameriwood Indus., Inc. v. Liberman*, 2006 WL 3825291, at *5-6 (E.D. Mo. Dec. 27, 2006).  (Def.'s Resp., Doc. 40, at 2, 3).

As demonstrated below, Defendant's arguments are factually and legally unsupportable.

## Argument

**I.     Defendant discloses for the first time in this case, on April 13, 2018, that backup tapes exist; Defendant should be ordered to produce the backup tape(s) for June 2013.**

Defendant claims that it has already searched for the fax logs regarding the June 22, 2013 fax but has been unable to find them which, according to Defendant, should end the matter. (Def.'s Resp. at 6). As it always has in this litigation, Defendant variously claims that as part of its routine procedures, fax logs were automatically overwritten "every couple of days," *see id*. at 2, or "within days or weeks," *id*. at 7.   Defendant relies upon the Rule 30(b)(6) testimony of Ms. Meaghen Greene, deposed in the *Geismann* case on April 13, 2017, who testified concerning the custom and practice regarding retaining transmissions logs within RightFax.   (Greene Dep. at 35:16, 36:10 - Doc. 40-1, Exhibit A filed under seal by Defendant).

Ms. Greene said nothing about the existence of backup tapes.   She further (erroneously) testified that David Morris conducted the search for the fax transmission logs, admitted she did not know specifically if Morris reviewed the records on the server operating the RightFax or a desktop that connected to RightFax, and admitted she did not know if Morris searched any SQL databases associated with the RightFax server software.  (Greene Dep. at 34, 35, 41 - Doc. 40-1).

Morris testified that the search of Defendant's records was actually conducted by former employee Rory McKenna, who at that time was the Manager of Enterprise Systems for Defendant. (Morris Dep., attached as Exhibit 17, at 26, 30).   Although Morris testified his request was to search "everything" to find the fax logs, including backup tapes, *id.* at *Id*. at 30, 31, 33, Morris's Declaration (signed on May 31, 2017, *see* Doc. 40-3), **makes no reference whatsoever to a search conducted of backup tapes.** Morris stated he directed his "Manager of Enterprise Systems to determine if AHOM still had fax transmission logs or any faxing records related to the fax attached to the Complaint within the production environment."  (*See* Morris

3

Decl., Doc. 40-3, ¶ 4).[1] Morris declared the search included "AHOM's servers and electronic databases, the fax server and the SQL servers used by RightFax[,] all of which were located at the company's data center at Peak 10," but no fax logs were found.  (*Id.*). Had a search actually been conducted of the backup tapes, it defies credulity that Morris would not have mentioned it in his Declaration, and would not have testified to that fact at his April 23 deposition, namely, that the backup tapes for June 2013 were requisitioned from Iron Mountain and searched.

The fax at issue in this case was received on June 22, 2013.  According to the procedures testified to by Mr. Morris, a quarterly backup tape would have been made on June 30, 2013, and that quarterly backup tape is retained for seven years, *i.e.*, June 2020.  Mr. Morris agreed that if the fax transmission logs for the June 22, 2013 fax were not on the backup tapes, that would mean the purge time would have had to have been less than 8 days.  (Morris Dep. attached as Exhibit 17, at 39).

Defendant's failure to disclose the existence of these backup tapes throughout the course of the *Geismann* litigation, and the instant litigation until April 13, 2018, is unexplainable and inexcusable.  **Nowhere** in the *Geismann* litigation did Defendant mention the existence of these backup tapes, much less produce them.  In fact, Defendant repeatedly denied it had records regarding facsimile transmissions.  (*See* Def.'s Resp. Req. Prod. (*Geismann*), attached as Exhibit 19, at Nos. 16, 28, 29).  Nor were the backup tapes disclosed in Defendant's responses to Plaintiff's requests to produce in this case, as erroneously claimed by the Defendant.  (*See* Def.'s Opp. Pl.'s Mot. Mod. Sch., Doc. 45, at 5 n. 3).  In fact, Defendant objected to providing mirror images of backup servers or backups of the hard drives connected with Defendant's fax server, not backup tapes.  (*See* Def.'s Resp. Pl. Req. Prod., Doc. 37-6, at Nos. 4-9).

---

[1] Thus, McKenna was also disclosed for the first time on April 23, 2018, although Defendant was obviously aware of his identity at the time of the Morris Declaration was signed, May 31, 2017.  (Doc. 40-3 at p. 2).

4

The undisclosed backup tapes makes Defendant's arguments regarding Plaintiff's expert Robert Biggerstaff's ability to locate the fax transmission logs irrelevant—the fax transmission logs and images will be contained in the June 30, 2013 quarterly backup tape, or they will not. (*See* Exhibit 18 - Second Declaration of Robert Biggerstaff ("Biggerstaff Decl. II"), ¶ 10). ("Based on the proposed examination of the data from the June 30, 2013 quarterly backup tape, I no longer need a mirror image of Defendant's entire SAN, as was originally requested by Plaintiff before I was made aware that there was a quarterly backup made of the RightFax system and SQL data.")[2]

Nonetheless, Plaintiff addresses Defendant's misguided argument.  Biggerstaff pointed out that the RightFax Version 10 Server Administrator's Guide ("RightFax Administrator's Guide"), at page 289, provided: "RightFax stores records of all faxes, even if users have deleted the faxes from their fax mailboxes.  When a user deletes a fax the record is saved and marked as belonging to a deleted fax." (Biggerstaff Decl., Doc. 37-2, ¶ 15).  Biggerstaff stated that based on his experience with databases and fax software, as well as my experience with RightFax in particular, "it is very likely the records of all faxes would be contained in the SQL database linked to Defendant's RightFax Server."  (*Id*. ¶ 16).

Defendant argues that Biggerstaff did not "consider any of the evidence adduced in *Geismann* concerning American Homepatient's routine procedure of overwriting fax transmission logs shortly after creation to make room for new files" and that he has "no basis, given the evidence in this case, to assert that these fax transmission records still exist or that he would be able to recover them."  (Def.'s Resp., Doc. 40, at 7).

---

[2] Defendant does not disagree—if imaging is "allowed" the backup tapes for 2013 are what should be imaged.  (Def.s' Resp. at 14).

Biggerstaff explains that the assertion Defendant implements a "routine procedure of overwriting fax transmission logs shortly after creation to make room for new files" make no sense:

> Users cannot "overwrite" RightFax transmission logs stored in SQL.  All the user can do is delete individual records of individual fax transmissions, but those deleted records are **still present and kept in the SQL data**, and can be retrieved. Purging the SQL data does not "overwrite" the deleted records.

(Biggerstaff Decl. II, attached as Exhibit 18, ¶ 12).

Defendant next asserts that the two sentences quoted above from the RightFax Administrator's Guide are "highly misleading" because "in the very next sentence of the RightFax user manual, it makes clear that even 'deleted' fax records are removed from the database in a process called 'purging' and that the length of time fax records are saved before being purged can be set by the user.  (Dkt. 37-3 at 289)."  (Def.'s Resp., Doc. 40, at 7-8). Defendant claims that is "precisely what happened in this case" – that according to Defendant's Rule 30(b)(6) witness, the fax records "would be 'automatically' overwritten after a certain amount of time."  (Def.'s Resp. at 8 (quoting Meaghen Greene deposition at 35:16 to 36:10)). Defendant concludes:

> As such, Biggerstaff's citation to this RightFax user manual does not support the contention that the fax transmission logs still exist today.  His misleading citation to the RightFax manual is undercut by both the evidence in this case and the very same manual he purports to use to support Plaintiff's position.

(Def.'s Resp. at 8.)

> Defendant is incorrect:

> Purging will remove deleted records from a database table, but those deleted and purged records are still present in unallocated space on the hard drive until the space where that data is written to the hard drive is reused.  Purged data can be, and is, frequently recoverable. There is no ability in RightFax for a user to intentionally or selectively "overwrite" particular fax transmission data.

(Biggerstaff Decl. II, attached as Exhibit 18,  ¶ 14).

6

In sum, Defendant's arguments regarding the RightFax Administrator Guide are not only irrelevant, they are wrong.   Based on the newly disclosed backup tapes, the examination procedure requested of the Court by Plaintiff is as follows, as again explained by Biggerstaff:

> In order for me to conduct a forensic examination of the data contained on the June 30, 2013 quarterly backup tape, the backup tape would need to be provided to a forensic computer tape specialist, who would then restore the data from the tape in a forensically sound manner in accordance with forensic data preservation principles including cryptographic signatures of the data.   Two copies would be made, with one copy supplied to me and another copy supplied to Defendant. After this is accomplished, I would examine the restored data and extract the data regarding the fax transmissions at issue, as set forth in Plaintiff's proposed EPO. (*See* Doc. 37-1 ¶ 6).   Thereafter, the procedures set forth in the EPO would govern my analysis.

(*Id*. ¶ 9).   Once Biggerstaff receives the restored data from June 30, 2013 backup tape, he expects to be able to analyze the restored data and provide a report to Defendant's Counsel within 14 days of receipt.   (*Id*., ¶ 17).

Finally, Defendant's footnote argument that Biggerstaff doesn't say how or where he obtained the RightFax Administrator's Guide and that he "fails to link it to defendant's systems," thereby rendering it hearsay is patently absurd and factually mistaken.   Defendant itself disclosed that it used RightFax software, version 10 in its answers to interrogatories in the *Geismann* litigation, thereby "linking" RightFax 10 to "Defendant's systems."   (*See Geismann v. American Homepatient*, Def.'s Ans. Pl.'s Interrog., attached as Exhibit 19, No. 22). Further, this isn't a motion for summary judgment or a trial; it is a motion to compel.   Defendant's hearsay argument is a nonstarter.

## II.   Plaintiff's request that the Court order Defendant to produce the June 30, 2013 backup tape comes nowhere close to exceeding the bounds of Rule 26.

Defendant argues that the requisite circumstances to search an opponent's computer system—discrepancies or inconsistencies raised in a party's discovery responses, or where a

party's computer systems bear some "special relation" to the litigation—are absent here.  (Def.'s Resp. at 9). Defendant is incorrect.

First, as set forth above, Defendant has concealed for years and/or failed to disclose the fact it even had backup tapes, and that its quarterly backup tapes are maintained for seven years. Even taking as true Defendant's dubious claim that its reference to "backup servers or backups of the hard drives connected with Defendant's fax server" in its November 2017 responses to Plaintiff's requests to produce in this case somehow operate as disclosure of the existence of backup tapes leaves unaccounted Defendant's failure to disclose such tapes in the *Geismann* litigation from August 2014 through 2015, 2016, and June, 2017.  Indeed, as late as June 29, 2017, in its sur-reply in opposition to class certification, Defendant relied heavily on the absence of fax transmission logs to oppose class certification.  (Def.s' Sur-Reply in Opp. Cl. Cert. (*Geismann*), Doc. 119, at 1-4, attached hereto as Exhibit 20).  In particular, Defendant argued that without the fax logs:

- Plaintiff cannot show whether the fax was "successfully sent," *id*. at 1; "Plaintiff does not present any evidence showing who received the Medicare Fax and who did not," *id*. at 2;

- "Without any class-wide evidence showing who was successfully sent the Medicare Fax, which is an essential element of its TCPA claim, Plaintiff is unable to satisfy the predominance inquiry of Rule 23(b)(3)," *id*.;

- "Plaintiff has no 'common evidence' to demonstrate at trial that class members were successfully sent the fax at issue," *id*. at 3;

- "Plaintiff has no fax transmission logs . . .," *id*; and

- "Without a class-wide method for showing successful sending of a fax, Plaintiff fails to show predominance of a common issue of *receipt* of the subject fax," *id*. at 4 (emphasis in original).

At the same time Defendant was making these arguments to the Court in the *Geismann* case, not a word was said by Defendant about the existence of the backup tapes discussed above. Juxtaposed against the testimony of Mr. Morris—that quarterly tapes of SAN data are stored for seven years, and that unless the RightFax data containing the fax transmission logs for the June 22, 2013 fax was purged within eight days, *i.e*., before the June 30, 2013 quarterly backup tape was generated, the fax logs would be on the backup tape—Defendant's argument set forth below is stunning in its mendacity:

> Since Plaintiff lacks the necessary evidence to demonstrate compliance with its Rule 23 obligations, it tries to shift blame to Defendant for supposedly "hiding" information.   These complaints are meritless.   At all times, Defendant has satisfied its discovery obligations, and moreover, has taken steps that go beyond what is required to attempt to locate records.   At the end of the day, Plaintiff is simply disappointed that, through no fault of Defendant, indicia of receipt does not exist.

(Def.'s Sur-Reply (*Geismann*), , attached as Exhibit 20,  at 5)[3]

In sum, if the foregoing does not constitute "discrepancies or inconsistencies raised in a party's discovery responses," it is unclear what would.

Second, it cannot be genuinely argued that the backup tapes that Plaintiff seeks do not bear a "special relation" to the instant case. Indeed, Defendant's sur-reply in *Geismann* set forth above dispose of such an argument forthwith.  The June 30, 2013 backup tape should have the fax transmission logs for the June 22, 2013 fax at issue, for the reasons stated above, if

---

[3] Equally disingenuous is Defendant's argument herein that "there are no facts presented in this case that warrant the creation or production of 'mirror images' of Defendant's hard drives and backup servers," and that this is a case where Plaintiff "waited too long to file suit and are unhappy that the records they seek no longer existed by the time of the first filing."   (Def.'s Resp. at 11).   Defendant's disclosure of the backup tapes puts the misstatement to this argument as well.

Defendant followed its procedures as testified to by Mr. Morris.  Defendant argues that "there is nothing special about American Homepatient's hard drives and backup servers that make their production necessary in this case."  (Def.'s Resp. at 10).  On the contrary, there may very well be something special about the June 30, 2013 backup tapes, the fax transmission logs at issue, and the Court should order that these tapes be produced for examination by Plaintiff's expert Robert Biggerstaff in accordance with the proposed EPO and the additional assertion set forth by Mr. Biggerstaff in his Declaration.  (Biggerstaff Decl. II, attached as Exhibit 18, ¶ 9).  Defendant's attempt to distinguish *Ameriwood* by arguing that in that case, the plaintiff wanted mirror images because of the hard drives use in the trade secret activity in that case and the need for "embedded data" that showed the hard drives use, *see* Def.'s Resp. at 11, supports ordering production of the backup tapes in that they too will show the faxing activity which is at the core of this case.

**III.     Defendant's argument that this case will be delayed for months is wrong, and ignores the fact that any delay was caused by Defendant's three-year failure to even mention much less produce the relevant backup tapes.**

Having concealed/failed to disclose the existence of its backup tapes since the <u>*Geismann*</u> case was filed in 2014, Defendant now argues that the mirror image sought by Plaintiff would result in months of delay as well as the production of a large amount of privileged information, including HIPAA information.  (Def.'s Resp. at 11, 12).  In particular, Defendant asserts that "the backup tapes of American Homepatient's SAN contain large amounts of data completely unrelated to this litigation."  (Def.'s Resp. at 12).  Defendant again adds that the fax transmission logs were automatically overwritten nearly a year before the *Geismann* lawsuit was filed.  (Def.'s Resp. at 12).

First, Plaintiff has narrowed its request to the June 30, 2013 backup tape(s).  Once the backup tape is restored with data, it will take Biggerstaff two weeks to perform his analysis.  (Biggerstaff II Decl., attached as Exhibit 18, ¶ 17).  Second, Defendant's argument was made

before the deposition of Mr. Morris was taken, wherein he testified *inter alia* that quarterly backup tapes are maintained for seven years and if the RightFax transmission logs were not purged before June 30, 2013, they should be on the quarterly backup tape for June 30, 2013, and stored with Iron Mountain.  As stated, Plaintiff no longer needs a mirror image of Defendant's entire SAN.  (*Id.*, ¶ 10).  Third, Defendant's argument that the data was overwritten ignores the existence of the backup tapes.

In short, Defendant's claim of delay is a nonstarter, particularly where Defendant's nondisclosure since the beginning of the *Geismann* case in August 2014 is the source of the delay.

**IV.  Plaintiff's proposed Electronic Protective Order is consistent with the procedures set forth in *Ameriwood*; Defendant has misconstrued *Ameriwood*.**

As set forth in detail in Plaintiff's Memorandum in Support at 7-10, Plaintiff proposed that a certified computer examiner ("CPE") be retained to create a mirror image of Defendant's SAN system ("ELECTRONIC DATA"), which would then be sent to Plaintiff's expert Biggerstaff and to Defense counsel.  (*See* Pl.'s Mem., Doc. 37, at 7; proposed EPO, Doc. 37-1 ¶¶ 1-3). Biggerstaff would then examine the ELECTRONIC DATA in accordance with the terms set forth in ¶ 5, create a disk/CD/DVD with what Biggerstaff believes falls into the categories of ¶ 5, and then send said disk/CD/DVD to <u>Defense counsel</u> for review.  (*Id*. at 7, 8; EPO ¶ 5). Thus, Defense counsel had the opportunity to object before any materials were turned over to Plaintiff, including getting said objection(s) ruled upon by the Court.  (*Id*. at 9; EPO ¶ 7, 8).

Now, in light of the backup tapes, the procedure is slightly modified, as set forth in the Biggerstaff II Decl., attached as Exhibit 18, at ¶ 9, namely, "the backup tape would need to be provided to a forensic computer tape specialist, who would then restore the data from the tape in a forensically sound manner in accordance with forensic data preservation principles including

cryptographic signatures of the data.  Two copies would be made, with one copy supplied to me and another copy supplied to Defendant."  The other procedures set forth in the proposed EPO would remain the same.

In a misguided attempt to attack Plaintiff's proposed EPO, Defendant claims the *Ameriwood* "three-step procedure" provides for (1) an independent third-party computer forensics expert to create a mirror image, providing the parties with a report describing the computer equipment produced and the expert's actions with respect to each piece of equipment; (2) the expert then recovers files (if possible) from defendant's computer systems and provides those files to defendant's counsel; and (3) defendant reviews the records for privilege and responsiveness, and supplements their production (to the extent necessary) with the files sought by plaintiff."  (Def.'s Resp. at 13 (citing *Ameriwood*, 2006 WL 3825291, at *6).)

Defendant argues that Plaintiff's EPO proposes that "instead of the mirror image being provided to defendant's counsel, as step two in *Ameriwood* requires, the mirror image would be provided to Plaintiff's expert witness Robert Biggerstaff."  (Def.'s Resp. at 13) (citing Doc. 37-1 ¶ 3).   Defendant then asserts that Biggerstaff has been retained by Plaintiff's counsel in numerous other TCPA matters and is in effect Plaintiff's counsel's "in house" computer expert. (*Id*.)

Ironically, in the face of its unseemly attempt to smear Biggerstaff, Defendant has misstated the procedures set forth in *Amerigard* "step one." Contrary to Defendant's self-serving and mistaken recitation, the Court in *Amerigard* states that "**plaintiff** will select a computer forensics expert of its choice (the 'Expert'), that has been trained in the area of data recovery, to produce mirror images . . . **Once the Expert is chosen, Plaintiff will notify defendants**. The

expert will then execute a confidentiality agreement agreed to by the parties and sign a copy of and abide by the protective order in the instant action."   *Ameriwood*, 2006 WL 3825291, at *5.

In other words, Plaintiff's proposed EPO matches exactly the procedure in *Amerigard* as to the selection of an expert.  However, based on the now-disclosed backup tape, an independent expert will need to be retained to restore the data from the June 30, 2013 backup tape.  Once this is done, the restored data will be sent to Defendant and to Biggerstaff, who will then perform his analysis of it.  That Biggerstaff analyzes the restored data from the backup tape is no different than step two in *Amerigard*, wherein **plaintiff's chosen expert** analyzes the image and provides recovered data to defense counsel.  *Id*. at *6.   That is exactly the same procedure proposed by Plaintiff in the EPO—Defendant is provided the disk/CD/DVD containing recovered data before it is provided to Plaintiff so that it may object or assert privilege as to recovered data.

Defendant's argument that Biggerstaff be allowed to review the entirety of Defendant's SAN for evidence is no longer relevant in light of the discovery of the existence of backup tapes. Defendant's argument that in *Ameriwood*, "it was defendant's counsel who reviewed the files recovered by the forensic expert and determined responsiveness," *see* Def.'s Resp. at 14, is premised on the false predicate that the expert in *Amerigard* was not selected by the plaintiff in that case. Moreover, if Biggerstaff is able to locate the June 22, 2013, fax logs and fax images, he will provide same to Defendant, who will then be obliged to produce them in the absence of an objection or claim of privilege.  It is hard to imagine such an objection.

In fact, courts regularly enter Orders providing that the party seeking the discovery select its own expert.  *See, e.g., Capitol Records, Inc. v. Alaujan*, 2009 WL 1292977, at *2 (D. Mass. May 6, 2009) ("Plaintiffs shall select a computer forensic expert of their choosing to produce a mirror-image of the Gateway computer's hard drive"); *Cenveo Corp. v. Slater*, 2007 WL

442387, at *2 (E.D. Pa. Jan. 31, 2007) ("Plaintiff shall select a computer forensics expert . . ."); and *Simon Prop. Group, L.P. v. mySimon, Inc*., 194 F.R.D. 639, 641 (S.D. Ind. 2000) ("plaintiff shall select and pay an expert who will inspect the computers in question to create a 'mirror image or 'snapshot' of the hard drives"); *see also* Plaintiff's Mem. in Supp., Doc. 37-15, 37-16, and 37-17 (Orders approving protocols similar to that proposed in the EPO).

Defendant's attack on Biggerstaff is the result of Defendant's recognition of Biggerstaff's substantial capabilities in this area and their apparent (and justified concern) that he will locate that which Defendant has either concealed, could not find, or did not look for.  As stated by Biggerstaff, in order to perform the searches required to recover fax logs, it is necessary that a forensic examiner have knowledge and experience in fax technology and fax software in addition to forensic recovery techniques.  (Biggerstaff Decl. II, attached as Exhibit 18, ¶ 16).  Many times a unique program needs to be developed to retrieve the fax transmission data and that can require sophisticated forensic recovery techniques.  (*Id*.)  Through Biggerstaff's years of experience, he has developed a number of proprietary and customized techniques and code to retrieve fax transmission data that performs such recovery.  (*Id.*)

Defendant's desperate attempt to tag Biggerstaff with *Reliable Money Order, Inc. v. McKnight Sales Co*., 704 F.3d 489, 499 (7th Cir. 2013) does not salvage its argument. The allegations to which Defendant refers against Plaintiff's counsel (made by the same Defense counsel as in this case) were found to be "pure sophistry" in *Creative Montessori Learning Center v. Ashford Gear, LLC*, 2012 WL 3961307, at *1–2 (N.D. Ill. Sept. 10, 2012) (Gettleman, J.), were rejected by the Seventh Circuit in *Reliable Money Order,* 704 F.3d at 501–02; *see also Chapman v. Wagener Equities, Inc.*, 2014 WL 540250, at *15 (N.D. Ill. Feb. 11, 2014) (holding *Reliable Money Order* "put the issue to rest"); and held to be "eliminated . . . on the merits" by

*Reliable Money Order* in *CE Design, Ltd. v. Cy's Crab House N., Inc.*, 731 F.3d 725, 730–31 (7th Cir. 2013).  Most importantly, the allegations put to bed in these cases did not involve any claims of misconduct against Biggerstaff, as Defendant's desperate argument implicitly recognizes.

Mr. Biggerstaff is a certified computer forensic examiner and a member of the International Society of Forensic Computer Examiners ("ISFCE").  (Biggerstaff Decl. II, attached as Exhibit 18, ¶ 19).  The ISFCE certifying authority has a strict code of ethics (*Id.* at 20) and he abides of the code of ethics (*Id.* at 21).  Mr. Biggerstaff has been subject to similar Protective Order in other cases and has always abided by the terms of the Protective Order (*Id.* at 23).  Mr. Biggerstaff is aware of the Plaintiff's Proposed Protective Order regarding computer forensic discovery (*Id.* at 22) and has declared that he will abide by the terms of the Protective Order if entered (*Id.* at 24).

Plaintiff no longer needs the Court to order Defendant to disclose the size of the Storage Area Network ("SAN") as Mr. Morris during his deposition testified it was 40TB (See Morris Dep., attached as Exhibit 17, at pg 18).  Plaintiff still needs to know the make and model of the components of the SAN and Mr. Morris testified that the IT Department would know the make and model of all the components of the SAN (See Morris Dep., attached as Exhibit 17, at pg 20).

Respectfully submitted,

/s/ Max G. Margulis
Max G. Margulis
**Margulis Law Group**
28 Old Belle Monte Rd.
Chesterfield, MO  63017
Telephone:  636-536-7022 – Residential
Fax:  636-536-6652 – Residential
Email: maxmargulis@margulislaw.com

Brian J. Wanca, IL # 3126474IL
**Anderson + Wanca**
3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
Telephone:  847-368-1500
Fax:  847-368-1501
Email: bwanca@andersonwanca.com

*Attorneys for Plaintiff Alan Presswood, D.C., P.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of May, 2018, I submitted the foregoing via this Court's CM/ES system, which served notice of the filing on the Attorneys for Defendant, John C. Ochoa (6302680IL), Molly Arranz (6281122IL), SmithAmundsen LLC, 150 North Michigan Avenue, Suite 3300, Chicago,  IL 60601; P: 312-894-3200, F: 312-997-1843, Email: JOChoa@salawus.com, and marranz@salawus.com and a courtesy copy was also served by email.

/s/ Max G. Margulis